**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION**

PHOENIX ENTERTAINMENT PARTNERS, LLC, a North Carolina Limited Liability Company,

        Plaintiff,

v.

KARRIE MICHELLE DAUGHERTY d/b/a SHORE DOGS, and NONIE KINER,

        Defendants.

Case No.: _____

## COMPLAINT AND JURY DEMAND

Plaintiff, Phoenix Entertainment Partners, LLC ("Plaintiff" or "PEP") complains of Defendant, Karrie Michelle Daugherty d/b/a Shore Dogs ("Shore Dogs") and Defendant, Nonie Kiner ("Kiner") (hereinafter collectively referred to as "Defendants") and for its Complaint alleges as follows:

## JURISDICTION AND VENUE

1.      This is an action for copyright infringement and trademark infringement in which the Defendants stands accused, variously, of making copies of and distributing karaoke accompaniment tracks, which tracks are the subject of Phoenix's copyrights; and of using Phoenix's federally registered service marks without authorization in the course of providing commercial karaoke entertainment services and related ancillary services; all without authorization.

2.      This action arises under §§ 32 and 43 of the Trademark Act of 1946, 15 U.S.C. §§ 1114 and 1125, as amended, as to the trademark infringement and unfair competition claims; and

under § 501 of the Copyright Act of 1976, as amended, 17 U.S.C. § 501, as to the copyright infringement claims.

3.     This Court has exclusive jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under the laws of the United States.

4.     This Court further has jurisdiction pursuant to 28 U.S.C. § 1338(a), in that this civil action arises under acts of Congress relating to trademarks and copyrights, and, as to the Plaintiff's unfair competition claim, pursuant to 28 U.S.C. § 1338(b), in that the claim is joined with a substantial and related claim under the trademark and copyright laws of the United States

5.     This Court has supplemental jurisdiction over the subject matter of PEP's state law claims pursuant to 28 U.S.C. § 1367(a), in that the claim is so related to PEP's federal claims that they form part of the same case or controversy.

6.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), because Defendant transacts business in this judicial district.

7.     This Court has personal jurisdiction over Defendants, in that Defendants conduct significant business in this State and federal judicial district, and the acts and events giving rise to this lawsuit of which the Defendants stands accused were undertaken in this State and federal judicial district.

## THE PLAINTIFF

8.     Plaintiff PEP is a North Carolina Limited Liability Company having its principal place of business in Pineville, North Carolina.

## THE DEFENDANTS

9.     Defendant, Shore Dogs, is an individual residing in this judicial district that operates a commercial establishment called Shore Dogs, a Fictitious Florida Corporation. On

information and belief, Shore Dogs' principal location is 5908 Thomas Drive, Panama City Beach, FL 32408. Shore Dogs provides karaoke entertainment to its patrons as an inducement for their patronage and purchase of food, drink, and other concessions.  Shore Dogs is referred to below as the Venue Defendant.

10.     Defendant, Kiner, is an individual residing in this judicial district. On information and belief, Kiner resides at 230 S Glades Trail, Panama City Beach, FL 32407. On information and belief, Kiner directs and controls Sweet Harmony Productions, LLC, an expired Utah Limited Liability Company.

## BACKGROUND FACTS

11.     Karaoke is a popular form of participatory entertainment commonly found in bars and restaurants and other types of venues throughout the United States.

12.     The basic premise of a karaoke show is that the venue hosting the show provides patrons with access to a sound system and specially prepared karaoke accompaniment tracks, so that individual patrons may perform for the crowd.

13.     Generally, a "karaoke accompaniment track" is an audiovisual work comprising a re-recorded version of a popular song without the lead vocals synchronized to a graphical component containing a lyric display, cueing information, and other information.

14.     When a karaoke accompaniment track is publicly performed, the graphical component is displayed to the patron who is performing and may be displayed to the crowd as well.

15.     Venues that offer karaoke entertainment do so as part of a commercial transaction wherein the venues supply their patrons with access to karaoke tracks and karaoke entertainment

services in exchange for their patronage of the establishment and the purchase of food and beverages.

16.     The purchase and consumption of alcoholic beverages in connection with karaoke shows is particularly encouraged to enable patrons to overcome inhibitions against singing in public.

17.     Most venues that offer karaoke entertainment, including the Venue Defendant, hire mobile entertainment operators, including Kiner, to make karaoke tracks available for patrons' use and to provide karaoke entertainment services on the venues' behalf.

18.     PEP is the owner of SOUND CHOICE®, a federally registered trademark in connection with which PEP licenses and distributes karaoke tracks and, primarily through licensees, provides karaoke entertainment services.

19.     The SOUND CHOICE brand originated with Slep-Tone Entertainment Corporation ("Slep-Tone"), Phoenix's predecessor-in-interest.

20.     Slep-Tone grew out of its founders' original karaoke-related business, founded in March 1985, which consisted of offering recording booths at theme parks as an entertainment service.

21.     As part of that service, the company would supply recording services and SOUND CHOICE backing tracks, to which customers would sing along.

22.     As the recording booth business because popular, customers began to request copies of the backing track alone, a development that led the company to offer those tracks for sale.

23.     The backing track business line quickly outstripped the recording booth service, which was divested by about 1990, although Slep-Tone continued to offer and sponsor karaoke entertainment services from time to time.

24.     SOUND CHOICE was first federally registered as a trademark on February 16, 1988, for "prerecorded magnetic cassette tapes containing popular music compositions," Reg. No. 1,476,683, which is now cancelled, having been superseded by a broader registration obtained in 1995.

25.     PEP is also the owner of CHARBUSTER KARAOKE®, a federally registered trademark, in connection with which PEP distributes karaoke tracks.

26.     In 2015, PEP acquired the CHARTBUSTER KARAOKE brand from Piracy Recover, LLC, which in turn acquired the brand from Tennessee Production Center, Inc., when Tennessee Production Center ceased operations.

27.     SOUND CHOICE-branded and CHARTBUSTER KARAOKE-branded karaoke tracks are wildly popular among karaoke entertainment providers, patrons, and home consumers. According to some estimates, as corroborated by investigative data, more than 70% of all accompaniment tracks played at commercial karaoke shows in the United States are either SOUND CHOICE- or CHARTBUSTER KARAOKE-branded tracks, with SOUND CHOICE-branded tracks alone commanding a market share that exceeds 50%.

28.     The popularity of SOUND CHOICE karaoke tracks derives from the market's perception that the recordings are usually the most faithful to the sound of the original recording artist, a characteristic highly valued by karaoke singers.

29.     SOUND CHOICE karaoke tracks are also perceived by the market as providing highly accurate singing cues as part of the video display, a characteristic that is also highly valued by karaoke singers.

30.     Likewise, the association of the SOUND CHOICE brand with a mobile entertainment operator's karaoke business and/or with a venue's karaoke entertainment offerings confers on the operator and venue a perception in the marketplace—and among karaoke patrons—of legitimacy and professionalism.

31.     Like all karaoke tracks, SOUND CHOICE and CHARTBUSTER KARAOKE tracks are easily and frequently (though illicitly) duplicated and shared among karaoke professionals for the express purpose of making those karaoke tracks available at commercial karaoke shows.

32.     Specifically, karaoke accompaniment track users have used the available technology to place the duplicated contents of one purchased disc on two or more computer systems for simultaneous use; to place the duplicated contents of their patrons' discs on their own computer hard drives for use in karaoke shows; to "swap" song files with other users; to obtain and share karaoke tracks via file-sharing sites and torrents; to purchase computer hard drives that were pre-loaded with duplicates of karaoke tracks; and, in cases when discs were actually purchased, to sell any original media they might have owned in the secondary market once they have made copies.

33.     This distribution allows karaoke accompaniment track users to gain the benefit of using SOUND CHOICE- and CHARTBUSTER KARAOKE-branded karaoke tracks without paying for or owning original media.

34.     To the extent that the Defendants, particularly Kiner, have undertaken any of the activities described in the preceding paragraph, those activities have been undertaken wholly without any form of payment to PEP.

## THE RIGHTS OF THE PLAINTIFF

35.     PEP is the owner of copyright in the audiovisual works listed in Exhibit A ("the Copyrights"), by virtue of an assignment instrument from Piracy Recovery, LLC, dated May 23, 2017.

36.     As the owner of the copyright in the audiovisual works, PEP has the exclusive rights, *inter alia*, to reproduce the works in copies; to distribute copies of the works to the public by sale or other transfer of ownership, or by rental, lease, or lending; and to perform the works publicly.

37.     Each of the claims of copyright in the audiovisual works identified in Exhibit A was registered with the United States Copyright Office prior to the commencement of this action, prior to the discovery by PEP of the Defendants' acts of copyright infringement, and prior to the commencement of the Defendants' acts of copyright infringement.

38.     The audiovisual works are the subject of separate copyright from the copyright in the underlying musical compositions they embody.

39.     PEP is the owner of the federal service mark registrations listed in Exhibit B ("the Sound Choice Marks"), by virtue of an assignment instrument from Slep-Tone dated February 15, 2015.

40.     Slep-Tone acquired its rights in the Sound Choice Marks by virtue of its registrations based on use of the marks in connection with the sale of karaoke accompaniment tracks from as early as 1987 and in connection with the advertising and performance of karaoke

entertainment services, directly from the 1980s onward and by related companies that include hundreds of controlled licensees from 2007 onward.

41.     PEP and its predecessor have, for the entire time the Sound Choice Marks have been federally registered, provided the public, including the Defendants, with notice of those federal registrations through the consistent application of the symbol ® to its marks in connection with its goods and services, when appropriate.

42.     Principally, the Sound Choice Marks are indicators of PEP as the origin of karaoke entertainment services provided in connection with the Sound Choice Marks.

43.     Among other things, PEP is in the business of licensing the Sound Choice Marks for karaoke entertainment services provided to patrons of commercial customers.

44.     The right to display the Sound Choice Marks in connection with commercial karaoke shows requires karaoke operators to acquire a license from PEP.

45.     PEP's licensing programs all require the operator to expend thousands of dollars, with the exact amount depending on the specific licensing arrangement selected.

46.     PEP's licensing programs also require the operator to submit to quality control procedures Phoenix has established for the purposes of protecting its Sound Choice brand.

47.     PEP and its predecessor have entered into more than 500 license agreements for the Sound Choice Marks with commercial karaoke operators in the United States, Canada, Mexico, Australia, and New Zealand.

48.     PEP is also the sole owner of Sound Choice Entertainment, LLC, a Texas limited liability company ("SCE") that is engaged in the business of providing karaoke entertainment services to venues in various locations around the United States.

49.     PEP is the owner of the federal service mark registration listed in Exhibit C ("the Chartbuster Karaoke Mark"), by virtue of an assignment instrument from Piracy Recovery, LLC dated November 10, 2015.

50.     Piracy Recovery, LLC obtained the Chartbuster Karaoke Mark by virtue of an assignment instrument from Tennessee Production Center, Inc. dated April 18, 2012.

51.     Tennessee Production Center acquired its rights in the Chartbuster Karaoke Mark by virtue of its registration based on use of the mark in connection with the sale of karaoke accompaniment tracks from as early as 1989.

## ACTIVITIES OF DEFENDANTS

**A)  Nonie Kiner**

52.     Kiner provided unauthorized karaoke services at Shore Dogs.

53.     On information and belief, Kiner directs and controls the activities of Sweet Harmony Productions, LLC.

54.     Kiner provides karaoke jockey services on behalf of Sweet Harmony Productions, LLC.

55.     Kiner directly benefits from the activities provided by Sweet Harmony Productions, LLC.

56.     Kiner operates a mobile entertainment business through which it provides karaoke entertainment services to its venue customers and other customers.

57.     In order to supply karaoke entertainment services to a venue, Kiner prepares and executes a karaoke show, by acquiring, or acquiring access to, appropriate sound equipment for playing karaoke accompaniment tracks; connecting the sound equipment to a source for karaoke accompaniment tracks; causing selected karaoke accompaniment tracks to be played over the

sound equipment; encouraging the venue's patrons to participate in the show; controlling the organization and flow of the performances; and acting as the on-microphone emcee of the show.

58.     During the course of supplying these karaoke entertainment services, Kiner repeatedly displays the Sound Choice Marks in connection with the services, often dozens of times over the course of a typical four-hour karaoke show.

59.     Because of the well-known association of the Sound Choice Marks with karaoke entertainment services, the display of the Sound Choice Marks in connection with the services, regardless of the particular song being played, acts as general advertisement for the services as well as an indicator of the quality of the services being provided.

60.     Because of the frequent, repeated display of the Sound Choice Marks across numerous instances of widely disparate songs, patrons and other consumers of Kiner's karaoke entertainment services are likely to view the display of the Sound Choice Marks as an indicator of the affiliation, connection, or association of Kiner and Shore Dogs with PEP, or of PEP's sponsorship or approval of their services and related commercial activities, rather than merely as the creator of the underlying communicative content of any particular song being performed

61.     When Kiner made the unauthorized copies of SOUND CHOICE-branded karaoke tracks that they use to provide karaoke entertainment services, they were not required, on any technological level, also to copy the Sound Choice Marks.

62.     Nevertheless, Kiner affirmatively chose also to copy the Sound Choice Marks when copying the tracks they used, in part because of an intent to trade upon the business goodwill associated with the Sound Choice Marks.

63.     The foregoing activities undertaken in connection with the Sound Choice Marks were undertaken in derogation of PEP's rights in the Sound Choice Marks.

64. Kiner's services, as undertaken in connection with the display of the Sound Choice Marks, were also therefore counterfeit.

65. Consumers of Kiner's services are likely to be confused regarding the regarding the affiliation or connection of Kiner with PEP, based on their mistaken belief that the services being provided are provided with PEP's knowledge and approval.

66. As a result of those activities, PEP has been damaged through the loss of revenues associated with the sale or licensing of legitimate services, as well as through the loss of PEP's ability to control the quality of services provided in connection with the Sound Choice Marks.

67. Kiner copied the audiovisual work(s) identified in Exhibit A, the copyright of which belongs to PEP.

68. When they copied the aforementioned audiovisual works, Kiner marked those copied tracks with the Chartbuster Karaoke Mark.

69. Kiner distributed the copies they made of the audiovisual work(s) identified in Exhibit A, and marked with the Chartbuster Karaoke Mark, to patrons of the venues where she provided karaoke entertainment services, by making those copies available for use and for public performance by patrons.

70. Kiner also caused the audiovisual work(s) identified in Exhibit A to be publicly performed at least one venue where she provided karaoke entertainment services.

71. Kiner did not have PEP's permission to make or acquire the copies, to mark the copies with the Chartbuster Karaoke Mark, to distribute the copies to the patrons, or to publicly perform the audiovisual works.

72.     Kiner's acts of reproduction, distribution, and public performance of the audiovisual works were undertaken in derogation of PEP's exclusive rights in those audiovisual works.

73.     Kiner's acts of marking the copied tracks with the Chartbuster Karaoke Mark were undertaken in derogation of PEP's right to control the use of those marks.

74.     As a result of those unauthorized acts of reproduction, marking, distribution, and public performance, PEP has been damaged.

75.     PEP believes that Kiner's acts of copyright infringement are not limited to the work(s) identified in Exhibit A, but that those acts extend to many such works in which PEP owns the copyright, and that discovery will reveal the extent of that infringement.

**B)** **Venue Defendant's Infringement of the Sound Choice Marks**

76.     Shore Dogs hosts karaoke shows comprising karaoke entertainment services at its establishment.

77.     At these karaoke shows, Shore Dogs supplies karaoke entertainment services to its patrons by contracting with an operator, in this case Kiner, as its agent for doing so.

78.     As the patrons are supplied with karaoke entertainment services, the Sound Choice Marks are repeatedly displayed in connection with the services.

79.     Because of the well-known association of the Sound Choice Marks with karaoke entertainment services, the display of the Sound Choice Marks in connection with the services, regardless of the particular song being played, acts as a general advertisement for the services as well as an indicator of the quality of the services being provided.

80.     Because of the frequent, repeated display of the Sound Choice Marks across numerous instances of widely disparate songs, patrons who receive karaoke entertainment services

from the Venue Defendant are likely to view the display of the Sound Choice Marks as an indicator of the affiliation, connection, or association of the Venue Defendant with PEP, or of PEP's sponsorship or approval of the services and related commercial activities, rather than merely as indicating PEP as the creator of the underlying communicative content of any particular song being performed.

81.     The foregoing activities undertaken in connection with the Sound Choice Marks were undertaken in derogation of PEP's rights in the Sound Choice Marks.

82.     The Venue Defendant's patrons are likely to be confused regarding the affiliation or connection of that Venue Defendant with PEP, based on their mistaken belief that the services being provided are provided with PEP's knowledge and approval.

83.     As a result of those activities, PEP has been damaged through the loss of revenues associated with the sale or licensing of legitimate services, as well as through the loss of PEP's ability to control the quality of services provided in connection with the Sound Choice Marks.

84.     The karaoke entertainment services the Venue Defendant provides to its patrons are an essential part of a commercial transaction wherein the patrons purchase food and beverages and receive access to the services in connection with their patronage, even if the patrons do not directly pay for access to the services.

85.     When the karaoke shows are ongoing, the shows are generally the principal entertainment focus of the Venue Defendant's establishment.

86.     The Venue Defendant derives value from these karaoke shows in the form of increased patronage and increased sales of food and beverages.

87.    Upon information and belief, the Venue Defendant has advertised the availability of karaoke shows on its premises, via its own advertising apparatus and as an activity attributable to its business, rather than as an adjunct or auxiliary to its business.

88.    The Venue Defendant has had actual knowledge of the foregoing activities being undertaken at its establishment.

89.    Specifically, Shore Dogs was notified by PEP by three (3) letters from PEP directed to: (1) Owner or Manager; (2) Kevin Simek; and (3) Karrie M. Daugherty on or around March 20, 2017, of the unlicensed, infringing character of the karaoke entertainment services being provided in its establishment.

90.    In the letters, the Venue Defendant was offered information about licensing and compliance programs that PEP offers to venues that feature karaoke entertainment, along with the opportunity to bring their karaoke entertainment services into compliance with the law and with PEP's policies regarding the use of its intellectual property.

91.    In particular, the Venue Defendant was offered the opportunity, at no charge, to request, via PEP's Safe Harbor program, that PEP evaluate the licensing status and needs of its karaoke entertainment provider and to avoid liability as long as the Venue Defendant took heed of PEP's evaluation and acted accordingly.

92.    The Venue Defendant did not take advantage of the Safe Harbor program.

93.    Despite these offers, and despite its knowledge of the unlicensed, infringing character of the karaoke entertainment services being provided in its establishments, the Venue Defendant elected not to bring their karaoke entertainment services into compliance.

94.    In particular, the Venue Defendant has the right to control whether or not the activities occur on its premises.

95.     As noted previously, the Venue Defendant had specific knowledge of its agents' direct infringement of the Sound Choice Marks.

96.     Despite this knowledge, the Venue Defendant continued to use those agents to commit direct infringement of the Sound Choice Marks during the course of providing karaoke entertainment services to its patrons.

97.     The Venue Defendant has the right to control the means and the details of the process by which Kiner accomplishes her respective tasks, including, without limitation, controlling the dates and starting and stopping times of shows, determining whether particular content (such as offensive-language content) is permitted to be played at shows, determining the style and genre of music played at shows, and determining whether Kiner permitted to use the venue's equipment (such as television displays, sound equipment, stage, etc.) as part of the shows.

98.     The Venue Defendant consented to an arrangement by which Kiner would provide karaoke entertainment services on its behalf and subject to its control, and Kiner likewise consented so to act.

99.     Despite its knowledge of the infringing character of the activities and ability to control whether those activities occur, the Venue Defendants each elected not to stop the infringement from occurring.

100.     As such, to the extent that they are not directly liable as an infringer, the Venue Defendant is liable as a secondary infringer for the continuing infringement that has occurred and is occurring on tis premises.

**C)** **Venue Defendant's Copyright Infringement**

101.   As noted above, Kiner committed copyright infringement of each of the audiovisual works identified in Exhibit A by copying, distributing, and publicly performing the work(s) without a license to do so.

102.   Specifically, Kiner distributed copies of the audiovisual work(s) by making those works available for public performance at karaoke shows.

103.   Kiner distributed copies of the audiovisual works on the Venue Defendant's premises.

104.   As detailed above, the Venue Defendant has the right and ability to supervise the distribution (and, where applicable, the public performance) of karaoke tracks on its premises.

105.   Also as detailed above, the Venue Defendants has a financial interest in making the audiovisual work(s) available at its establishment—to wit, the entertainment of its paying customers as an inducement to their patronage of the establishment.

106.   Indeed, the Venue Defendant has a particular interest in making the broadest number of tracks available to its patrons, because a patron who wishes to sing a particular track will be inclined to patronize some other establishment that makes that track available if the Venue Defendant does not.

107.   As such, the Venue Defendant is vicariously liable for Kiner's acts of copyright infringement of the work(s) identified in Exhibit A, which acts occurred on its premises, including both distribution and public performance where applicable.

**D) <u>The Defendants' Pattern of Infringing Conduct</u>**

108.   The Defendants' conduct as described above with respect to the Sound Choice Marks and, as applicable, to PEP's copyrights and the Chartbuster Karaoke Mark, extends as part of a large-scale program of infringing activities and piracy.

109.   Essentially, the Defendants have built an entire business model and moneymaking scheme premised on a competitive advantage for play at a show is a commercial act from which Defendants derived from the infringement of the intellectual property rights of others, including PEP.

110.   The Defendants' activities directly compete with PEP's own licensees and PEP's wholly owned subsidiary company, SCE, by using identical but unauthorized trademarks in connection with services that are neither authorized nor subject to PPE's quality control.

111.   The Defendant's wrongful conduct exerts illegitimate and unfair pressure upon the market for karaoke services in this State and judicial district through the unlicensed use of pirated material belonging to PEP, thereby diminishing the value of licenses and permissions in the hands of PEP, its subsidiary, and its licensees.

112.   The diminution of the value of licenses encourages or forces karaoke operators to forego licenses in order to compete profitably.

113.   Upon information and belief, the Defendants' misconduct has cost PEP in excess of $100,000 in revenue from legitimate sources crowded out of the market by their wrongful conduct.

**<u>FIRST CLAIM FOR RELIEF</u>**
**<u>TRADEMARK INFRINGEMENT UNDER 15 U.S.C. § 1114(1)</u>**

114.   Each Defendant used a reproduction, counterfeit, or copy of the Sound Choice Marks in connection with the provision of services including karaoke services, by repeatedly

displaying a reproduction, counterfeit, or copy of the Sound Choice Marks during the provision of those services.

115.    Kiner used a reproduction, counterfeit, or copy of the Chartbuster Karaoke Mark in connection with the distribution of goods including karaoke accompaniment tracks, by copying karaoke accompaniment tracks, marking the tracks with the Chartbuster Karaoke Mark, and transporting the marked tracks in commerce in order to supply those tracks to patrons at the Venue Defendant's establishment.

116.    Each Defendant's use of the Sound Choice Marks and, as applicable, the Chartbuster Karaoke Mark, was "in commerce" within the meaning of the Trademark Act of 1946 as amended.

117.    PEP did not license any Defendant to use the Sound Choice Marks or the Chartbuster Karaoke Mark in connection with the provision of their goods or services.

118.    Each Defendant's use of the Sound Choice Marks or, as applicable, the Chartbuster Karaoke Mark, is likely to cause confusion, or to cause mistake, or to deceive its customers and patrons into believing that the goods and services being provided are provided with the authorization of Phoenix.

119.    Each Defendant's use of the Sound Choice Marks in connection with their karaoke entertainment services infringes both the "goods" Sound Choice Marks and the "services" Sound Choice Marks because karaoke entertainment services are within the zone of natural expansion of Phoenix's karaoke accompaniment track business.

120.    Each Defendant's acts were willful, knowing, and intentional.

121.    The Venue Defendant is additionally vicariously or contributorily liable for the acts of its agent that infringe the Sound Choice Marks or the Chartbuster Karaoke Mark.

122.    Each Defendant's activities therefore constitute the infringement of the federally registered Sound Choice Marks and/or the Chartbuster Karaoke Mark in violation of 15 U.S.C. § 1114(1).

123.    PEP has been damaged by each Defendant's infringing activities.

124.    Unless enjoined by the Court, each Defendant's infringing activities as described above will continue unabated and will continue to cause harm to PEP.

### SECOND CLAIM FOR RELIEF
### UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(a)

125.    Each Defendant has supplied karaoke entertainment services to customers or patrons, in connection with which the Sound Choice Marks were used in the advertising and performance of the services and not merely as an adjunct to the playing of any particular communicative content contained within karaoke accompaniment tracks.

126.    The use of the Sound Choice Marks is likely to cause confusion, or to cause mistake, or to deceive the customers or patrons into believing, falsely, that PEP approved the Defendant's services and commercial activities.

127.    Because of each Defendant's wholly unauthorized uses of the Sound Choice Marks in the manner described above, PEP was denied revenue from the sale or licensing of authorized services and deprived of control over the use of the Sound Choice Marks.

128.    Because PEP has been denied this revenue and control, it has been damaged by each Defendant's uses.

129.    PEP is a provider of karaoke entertainment services, directly, through controlled licensees, and through its wholly owned subsidiary SCE.

130.    Each Defendant's activities are part of a program and money-making scheme premised upon the provision of unlicensed karaoke entertainment services undertaken in connection with the Sound Choice Marks.

131.    Each Defendant's activities in furtherance of this program of infringement have caused a competitive injury to PEP, both directly and on the basis of damage to SCE and to Phoenix's licensees.

132.    Each Defendant's activities constitute unfair competition in violation of 15 U.S.C. § 1125(a).

133.    Unless enjoined by the Court, each Defendant's unfair competition activities as described above will continue unabated and will continue to cause harm to PEP.

**THIRD CLAIM FOR RELIEF**
**COPYRIGHT INFRINGEMENT UNDER 17 U.S.C. § 501**

134.    PEP's copyright(s) in the audiovisual work(s) listed in Exhibit A are valid and subsisting.

135.    Kiner reproduced or caused to be reproduced each of the works listed Exhibit A, in violation of PEP's exclusive rights, without PEP's permission.

136.    Kiner additionally made those unauthorized copies of the work(s) available to venue patrons for use, thereby distributing the works in violation of PEP's exclusive rights, without PEP's permission.

137.    Kiner additionally caused or permitted the work(s) to be publicly performed, in violation of PEP's exclusive rights, without PEP's permission.

138.    The Venue Defendant permitted Kiner's acts of distribution to occur on its premises.

139.    The Venue Defendant additionally permitted Kiner's acts of public performance to occur on its premises.

140.    The Venue Defendant had the right and ability to supervise Kiner in the activities that constituted direct copyright infringement on the part of Kiner.

141.    The Venue Defendant had a financial interest in the acts of distribution that constituted direct copyright infringement on the part of Kiner.

142.    The Venue Defendant additionally had a financial interest in the acts of public performance that constituted direct copyright infringement on the part of Kiner.

143.    As such, the Venue Defendant is vicariously liable for that copyright infringement.

144.    The Venue Defendant had actual knowledge of the copyright infringement occurring on its premises.

145.    Each Defendant's acts as identified above constitute knowing, and therefore willful, infringement of PEP's copyright in the subject audiovisual work.

146.    As a result of these acts of infringement, PEP has been damaged.

**FOURTH CLAIM FOR RELIEF**
**VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES**
**ACT (FDUTPA) Fla. Stat. §501.201, *et seq.***

147.    Shore Dogs utilized unauthorized karaoke providers to provide commercial karaoke services at its establishment, and it had the right and ability to control its use of authorized or counterfeit materials for sale commercial purposes.

148.    At the times complained herein, Shore Dogs permitted Kiner to engage in acts of infringement of the Sound Choice Marks and the Chartbuster Mark, in derogation of PEP's common law and statutory rights in those marks.

149.    Shore Dogs derived economic benefit from the unauthorized karaoke services provided at its establishment.

150.    Shore Dogs permitting acts of infringement constitute unfair or deceptive acts or practices within the meaning of Fla. Stat. § 501.204(1) (2009).

151.    Shore Dogs enabling acts of infringement cause likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by PEP.

152.    As a direct and proximate result of each act of infringement at Shore Dogs and its encouragement thereof, PEP has suffered a pecuniary loss, including the loss of revenue associated with sales or distribution of compact discs to karaoke jockeys, commensurate with the demand for the contents of those discs, which revenue would have been received but for the acts in creating or acquiring counterfeits of SOUND CHOICE®-branded or CHARTBUSTER KARAOKE®-branded accompaniment tracks.

153.    As such, PEP has been damaged and is likely to be further damaged by the deceptive trade practice of Shore Dogs, within the meaning of Fla. Stat. § 501.204(1) (2009).

154.    Unless enjoined by the Court, Shore Dogs' unfair competition activities as described above will continue unabated and will continue to cause harm to PEP.

155.    Kiner used and knowingly directly benefited from the use of a reproduction, counterfeit, or copy of the Sound Choice Marks or the Chartbuster Mark in connection with the provision of services including karaoke services, by manufacturing or acquiring the reproduction, counterfeit, or copy of the Sound Choice Marks or the Chartbuster Mark, and by displaying the reproduction, counterfeit, or copy of the Sound Choice Marks or the Chartbuster Mark during the provision of those services.

156.    Shore Dogs derived an economic benefit.

157.    Kiner's acts of infringement constitute unfair or deceptive acts or practices within the meaning of Fla. Stat. § 501.204(1) (2009).

158.    Kiner's acts of infringement cause likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by PEP.

159.    As a direct and proximate result of each of Kiner's acts of infringement PEP has suffered a pecuniary loss, including the loss of revenue associated with sales or distribution of compact discs to karaoke jockeys, commensurate with the demand for the contents of those discs, which revenue would have been received but for Kiner's acts in creating or acquiring counterfeits of SOUND CHOICE®-branded or CHARTBUSTER KARAOKE®-branded accompaniment tracks.

160.    Kiner is liable for the acts complained of in this count based *inter alia* on her direction and control of Sweet Harmony Productions, LLC.

161.    Unless enjoined by the Court, Kiner's unfair competition activities as described above will continue unabated and will continue to cause harm to PEP.

162.    PEP is entitled to its attorneys' fees and costs pursuant to Fla. Stat. §501.2105.


**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, PEP, prays for judgment against the Defendants, and that the Court:

A.    Find that each Defendant has committed acts of infringement, including but not limited to counterfeiting, of the federally registered Sound Choice Marks and the federally registered Chartbuster Karaoke Mark, in violation of 15 U.S.C. § 1114(1);

B. Find that Defendants engaged in unfair competition detrimental to PEP in violation of 15 U.S.C. § 1125(a);

C. Find that Defendants have committed acts of infringement of works in which PEP owns the copyright, in violation of 17 U.S.C. § 106;

D. Enter judgment against Defendants and in favor of PEP on all applicable counts;

E. Award to PEP each Defendant's profits and the damages sustained by PEP because of that Defendant's conduct in infringing the Sound Choice Marks or the Chartbuster Karaoke Mark or both, or, in the alternative, statutory damages per trademark infringed by counterfeiting and in any event in an amount not less than Fifty Thousand and no/100 Dollars ($50,000.00) per Defendant;

F. Award to PEP each Defendant's profits and the damages sustained by PEP because of that Defendant's acts of unfair competition under 15 U.S.C. § 1125(a);

G. Award to PEP statutory damages for the acts of copyright infringement, pursuant to 17 U.S.C. § 504, if available, or actual damages, if not;

H. Award to PEP treble, punitive, or otherwise enhanced damages, as available, upon a finding that any Defendant acted willfully in the conduct of its infringement;

I. Grant PEP preliminary and permanent injunctive relief against further infringement of the Sound Choice Marks and the Chartbuster Karaoke Mark, further false designations of origin, and further infringement of PEP's copyrights by each Defendant;

J. Award PEP its costs suit and attorney fees, to the extent not awarded above; and

K. Grant PEP such other and further relief as justice may require.

**JURY DEMAND**

PEP demands trial by jury on all issues so triable.

Date: November 8, 2017                                    Respectfully submitted,

                                                          */s/ Woodrow H Pollack*
                                                          Woodrow H. Pollack
                                                          Trial Counsel
                                                          Florida Bar No. 026802
                                                          **GREENBERG TRAURIG, LLP**
                                                          101 East Kennedy Blvd, Suite 1900
                                                          Tampa, Florida 33602
                                                          (813) 318-5700
                                                          (813) 318-5900 (facsimile)
                                                          pollackw@gtlaw.com
                                                          *Attorney for Plaintiff*